

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SCOTT TAGGART ROETHLE, M.D., )<br>)<br>)<br>Defendant. ) | N<sub>o</sub> **4:21CR00465 RLW/SRW** |

## INDICTMENT

The Grand Jury charges that:

## BACKGROUND

### Defendants

1. Since in or about 2005, Defendant Scott Taggart Roethle, M.D., has been a licensed medical doctor with a specialty in anesthesiology. At times relevant to this indictment, the Defendant was licensed in 22 states, including Missouri, Kansas, and Texas.

2. At times relevant to this indictment, the Defendant was employed by or contracted with, companies that provided health care-related services and submitted reimbursement claims to Medicare, Medicaid, Tricare, and other health care benefit programs for services that the Defendant purportedly provided.

### Relevant Medicare Provisions

3. The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program, which is a federal health benefits program for the elderly and disabled. There are four parts to Medicare, each part providing coverage for different health care services: Part A (hospital and

inpatient services); Part B (outpatient services); Medicare Part C (Medicare Advantage Plans); and Part D (prescription drugs).

4. Medicare Part B reimburses health care providers for covered health services provided to Medicare beneficiaries in outpatient settings. The covered services include, but are not limited to, durable medical equipment ("DME") and diagnostic tests that have been determined to be medically necessary and ordered by a medical doctor, nurse practitioner, physician assistant, or other Medicare authorized provider (referred to collectively as "doctor" or "physician."). As to diagnostic tests, Medicare Part B reimburses for diagnostic tests only if, among other requirements, the tests were ordered by a physician treating the beneficiary, that is, the physician furnished a consultation or treated a beneficiary for a specific medical problem and used the results of the tests in the management of the beneficiary's specific medical problem.

5. The Medicare Advantage Program, known as Medicare Part C, offers beneficiaries a managed care option by allowing individuals to enroll in private health plans rather than having their care covered through Medicare Part A or Part B. CMS contracts with Medicare Advantage programs to provide medically necessary health services to beneficiaries; in return, CMS makes monthly payments to the Medicare Advantage programs for enrolled beneficiaries.

6. Medicare Part D is administered through private companies, called plan sponsors, which offer retail prescription drug coverage to Medicare beneficiaries. The plan sponsors contract with pharmacies, which fill prescriptions and dispense the prescription drugs to Medicare beneficiaries. The pharmacies submit reimbursement claims to the plan sponsors for the medications dispensed to Medicare patients.

7.     CMS acts through fiscal agents called Medicare Administrative Contractors, or "MACs," which are statutory agents for CMS for Medicare Part B. The MACs are private entities that review claims and make payments to providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic areas, including determining whether the claim is for a covered service.

8.     To receive Medicare reimbursement, providers must make appropriate application to the MAC and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules. After successful completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.

9.     Medicare providers must retain clinical records for the period required by state law or five years from the date of discharge if there is no requirement in state law.

## Defendant's Enrollment in Medicare

10.     On or about December 3, 2009, February 27, 2011, April 18, 2014, February 20, 2015, and April 8, 2015, the Defendant signed Medicare enrollment applications and certified therein:

> I have read and understand the Penalties for Falsifying Information, as printed in the application. I understand that any deliberate omission, misrepresentation, or falsification of any information ... contained in any communication supplying information to Medicare ... [may be criminally prosecuted] . . .
>
> I agree to abide by the Medicare laws, regulations and program instructions . . . including the **Federal anti-kickback statute.**
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

(emphasis added).

3

11. On or about February 27, 2011, February 20, 2015, and May 31, 2018, the Defendant signed Medicare reassignment of benefit forms, wherein he was informed that "Providers and suppliers enrolled in Medicare are required to ensure strict compliance with Medicare regulations, including payment policy and coverage guidelines."

### Relevant Medicaid Provisions

12. The Medicaid Program is jointly funded by the states and the federal government. The Medicaid Program reimburses health care providers for covered services rendered to eligible low-income Medicaid recipients. At times relevant to this indictment, the Defendant was an enrolled Medicaid provider in several states, including but not limited to Missouri, Kansas, and Texas.

### Relevant Tricare Provisions

13. Tricare is a federally funded program that reimburses providers for health care services provided to active, retired, reserve, guard, and uniformed service members and their families. The Defense Health Agency ("DHA") is a joint, integrated agency that supports the delivery of health services to military health system beneficiaries. DHA exercises management responsibility for Tricare and receives, processes, and pays claims on behalf of Tricare.

### Federal Anti-Kickback Statute

14. Compliance with the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) ("AKS") is a condition of payment for both Medicare and Medicaid. In other words, Medicare and Medicaid will not pay for services that are provided in violation of the AKS.

15. The AKS makes it a criminal offense for any person to knowingly and willfully solicit, offer, pay, or receive remuneration in return for or to induce any person to refer, recommend, furnish, or arrange for the furnishing of any items, goods, and services, paid in

whole or in part by any federally funded health care program. Both parties to such an arrangement may be criminally liable if one purpose of the arrangement is to obtain remuneration for the referral of services or to induce referrals.

16. Remuneration is broadly defined as anything of value, including money, goods, services, or the release or forgiveness of a financial obligation that the other party would normally have to pay. In passing the AKS, Congress intended to prohibit financial incentives that could affect the medical judgment of those providing health care services or referring patients for health care services.

### Count 1
### Conspiracy
### 18 U.S.C. § 371

17. Paragraphs 1 to 16 are incorporated by reference as if fully set out herein.

18. Beginning in or about 2017 and continuing to in or about 2020, in the Eastern District of Missouri and elsewhere,

**SCOTT TAGGART ROETHLE, M.D.,**

the Defendant herein, and persons known and unknown to the Grand Jury, did unlawfully, willfully, and knowingly combine, conspire, and agree with persons known and unknown to the grand jury to commit the following offenses against the United States:

    a.    to defraud a health care benefit program and to obtain, by false and fraudulent representations, money owned by and under the control of a health care benefit program, in connection with the delivery and payment of health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347(a)(1) and (2);

5

b. to create and use materially false and fraudulent documents, including patient assessment and evaluation records, treatment orders and prescriptions, and reimbursement claims for health care items and services, in violation of Title 18, United States Code, Section 1035(a)(2); and

c. to knowingly and willfully solicit, offer, pay, and receive kickbacks, bribes, and rebates for referrals for services to be reimbursed in whole or part by a federal health care benefit program, in violation of Title 42, United States Code, Section 1320a-7b(b).

**Purpose of the Conspiracy**

19. The purpose of the conspiracy was for:

a. the Defendant and others to receive illegal kickbacks in return for ordering and providing medically unnecessary durable medical equipment, genetic tests, and pain creams (collectively referred to as "Health Care Services") for patients with whom they did not have a doctor-patient relationship and had not determined the medical need for the Health Care Services; and

b. the Defendant and his co-conspirators to enrich themselves by causing health insurers to reimburse for medically unnecessary Health Care Services.

**Manner and Means of the Conspiracy**

20. Telemedicine or telehealth refers to the practice of caring for patients when the health care provider and the patient are in different physical locations. Using audio and video

6

technology, telemedicine health care professionals evaluate, diagnose, and treat patients when they are in different locations.

21. It was part of the conspiracy that from in or about 2017 to in or about 2020, the Defendant contracted and worked as a telemedicine doctor for several companies, including but not limited to Encore Telemed/LocumTenens USA, MedSymphony, Expansion Media, Pioneer Telemedicine, AtMed, United Health Network, Lifeline Recruiting, BodMD, Firefly XD, and Dial 4ME. The Defendant's telemedicine work was in addition to his work as an anesthesiologist at health care facilities in Kansas and Missouri.

22. It was part of the conspiracy that marketing companies ran television and online ads offering orthotic braces and other services, at no cost, to patients. When a patient responded to the ad, an employee of a call center collected pertinent information from the patient, including the patient's name and address, the name of the patient's primary care physician, insurance information, Medicare number, and areas of pain. In some instances, the marketers made "cold calls" to patients.

23. It was further part of the conspiracy that the telemarketers and intake workers (some from outside the United States) purportedly conducted an intake interview with the patients by phone or videoconference. The telemarketers and intake workers were not medical professionals or otherwise qualified to determine the patients' medical need for Health Care Services. In some cases, the patients were pressured to exaggerate the severity and duration of their pain.

24. It was further part of the conspiracy that the marketing companies and telemedicine companies sent the patient information, obtained by the marketers and intake workers, to telemedicine doctors who signed orders and certified that the patients needed the

7

Health Care Services. In almost all instances, the telemedicine doctors had no prior doctor-patient relationship with the patients, did not directly communicate with the patients, and did not evaluate or assess the patients' medical need for the Health Care Services. The marketing or telemedicine companies sent the orders signed by telemedicine doctors to clinical testing labs, pharmacies, and DME companies, many of whom paid the marketing and telemedicine companies illegal kickbacks for the orders.

25. It was further part of the conspiracy that the marketing and telemedicine companies (listed above in paragraph 21) gave the Defendant access to electronic portals to review documents related to the patients assigned to him. The electronic documents contained the patient's demographic information, chief complaint, insurance number, and the durable medical equipment or other services the patient's insurance would cover.

26. The Defendant knew that the patients assigned to him were identified through mass telemarketing and cold calls and that the patients often lived in states far distant from his residence or practice. The Defendant further knew that the telemarketers and the intake workers were not medical professionals and that he, as the physician, had to determine the medical necessity for all Health Care Services that he ordered. Nonetheless, in almost all instances, the Defendant did not speak to the patients or otherwise attempt in any way to evaluate and determine the patients' actual medical needs. The Defendant did not know the patients or have a prior doctor-patient relationship; nor did the Defendant provide any follow-up care to the patients after he ordered Health Care Services for them.

**Fraudulent Orders for Orthotic Braces**

27. Durable medical equipment ("DME") includes but is not limited to hospital beds, wheelchairs, and orthoses ("braces") for knees, wrists, shoulders, and other parts of the body.

8

Medicare, Medicaid, and other insurers will reimburse for DME if a doctor or other qualified health professional determines that the DME is medically necessary for the patient. That is, the doctor or qualified health professional must diagnose the patient's condition and determine that a particular brace will help alleviate the patient's problems

28. It was part of the conspiracy that the intake workers employed by the marketing companies and call centers were not qualified to determine whether a patient needed a brace, or the type of brace needed. Instead of assessing the patients' need for braces, the Defendant simply ordered the braces that the intake worker indicated insurance would cover, resulting in patients receiving braces they did not need or want. As a result, the Defendant received many complaints from patients, who asked why they had received calls about orthotic braces and why they received orthotic braces, which they did not need and had not requested.

**Defendant's Fraudulent Orders for Knee Braces**

29. Medicare will reimburse for knee braces if a physician or qualified health professional determines knee braces are reasonable and medically necessary for a Medicare patient who has had a recent injury to, or a surgical procedure on, the knees or who is ambulatory and has knee instability. To establish knee instability, the physician must perform and document the clinical examination of the knee, including the tests performed on the knee, and include an objective description of the joint laxity. Pain or a subjective description of joint instability is insufficient to establish medical necessity for a knee brace.

30. It was part of the conspiracy that the Defendant ordered knee braces although no examinations or tests of the patients' knees had been performed. The Defendant was aware that tests were required because the physician order forms that he signed expressly stated: "Knee tests required to prescribe any knee orthotic. [A] minimum of 2 tests is required for each knee with a

9

brace prescribed." The Defendant knew a "Pivot Shift Test" and a "Cabot's Maneuver" had not been done on the patients' knees when he signed the orders and certified these tests had been done.

31. It was further part of the conspiracy that - on hundreds of occasions - the Defendant signed the following medical necessity statement for knee braces and falsely and fraudulently certified:

> I certify that the patient has the medical condition(s) listed and is being treated by me. All the information contained on this physician's order accurately reflects the patient's medical condition(s) and is medically necessary with reference to the standards of medical practice for this patient's condition(s). The medical records for this patient substantiate the prescribed treatment plan.

Contrary to the Defendant's certifications, he was not treating the patients, he had not determined the medical necessity for the knee braces, and the medical records did not substantiate the need for the knee braces.

32. It was further part of the conspiracy that, although the Defendant did not have the required doctor-patient relationship with the patients for whom he was signing orders and prescriptions, he falsely attested in numerous documents: "I established a valid prescriber-patient relationship with the Patient identified above, which continued through the consult date and/or date of this prescription. . . . I am aware of and my practice confirms with applicable State laws as they relate to requirements for establishing a valid prescriber-patient relationship."

33. It was further part of the conspiracy that on or about August 2, 2018, the Defendant signed medical necessity statements for Patient P.R, a 95-year-old woman and on September 19, 2018, the Defendant signed medical necessity statements for Patient B.R., an 87-year-old woman. Prior to ordering knee braces for the two patients, the Defendant never had contact with, examined, treated, or determined the patients' need for the knee braces.

34. It was further part of the conspiracy that between October 2017 and April 2019, the Defendant fraudulently ordered one or more knee braces for approximately 3,584 patients. The DME companies that supplied the knee braces billed Medicare Part B $6,512,870 and were paid at least $2,874,948 based on the Defendant's fraudulent orders for knee braces.

35. It was further part of the conspiracy that the Defendant ordered orthotics, including knee braces, for 6,393 Medicare patients. The DME companies, to whom the orders were sent, billed Medicare $18,795,749 based on the Defendant's orders and were paid at least $8,395,718.

36. It was further part of the conspiracy that DME companies, including MC Medical Supply and Integrity Medical Supply located in Cape Girardeau, Missouri, paid illegal kickbacks for DME orders referred or sent to them. At times relevant to this indictment, MC Medical Supply, owned by co-conspirator Brandy McKay, and Integrity Medical Supply, owned by co-conspirators Jackson Siples and "silent partner" Jamie McCoy, paid R&L Marketing, owned by R.F., as much as $250 for each order referred to them. Some of these orders were signed by the Defendant who had received an illegal kickback from the marketing and telemedicine companies for each order that he signed.

37. It was further part of the conspiracy that MC Medical Supply and Integrity Medical Supply submitted reimbursement claims to Medicare and other health care benefit plans for the orders, including hundreds signed by the Defendant.

**Defendant's Fraudulent Orders for Genetic (CGx and PGx) Tests**

38. Cancer genomic ("CGx") tests use DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. Pharmacogenetic ("PGx") testing is used to detect specific genetic variations in genes that

impact the metabolism of certain medications and, thus, help determine the effectiveness of such medications if used by a particular patient.

39. Federal law and regulations provide that Medicare will not reimburse for diagnostic tests, including genetic tests, that are not reasonable and necessary for the diagnosis or treatment of a specific illness, symptoms, complaint, or injury. The Defendant knew he was required to determine medical necessity before ordering genetic tests for patients and that the patient's desire or request for genetic tests did not establish medical necessity.

40. It was part of the conspiracy that the Defendant signed numerous CGx and PGx orders, which contained the following "Confirmation of Informed Consent and Medical Necessity," which he knew to be false and fraudulent:

> The tests ordered are medically necessary for the risk assessment, diagnosis or detection of a disease, illness, impairment, symptom, syndrome or disorder. The results will determine the patient's medical management and treatment decisions. The person listed as the Ordering Physician is legally authorized to order the test(s) herein. The patient was provided information about genetic testing and has consented to genetic testing.

41. The Defendant knew the above statement was false because he had not determined that the patients needed the genetic tests and the results of the tests were not used in the management of the patients' treatment and care.

42. It was part of the conspiracy that on or about February 4, 2019, the Defendant signed the above-described CGx order form for A.F., a 62-year-old patient, and caused the order to be transmitted to LPS Toxicology Laboratories. The Defendant had no contact with patient A.F. and did not determine that patient A.F. had a medical need for the CGx test.

43. Signing CGx and PGx orders for patients without determining medical necessity was standard practice for the Defendant. As an example, in or about September 2018, the Defendant agreed to sign multiple CGx tests after receiving a September 14, 2018 email from

Encore Telemed/LocumTenens USA. The email asked the Defendant if he was interested in reviewing and signing "about 180 CGx/PGx files/patients that they have completed intakes and waiting to be processed. We just need them to be reviewed by a handful of doctors, Docu-signed and returned so we can send them *off* to the Lab." The Defendant responded the same day: "I can do it . . ."

44. The Defendant knew it was highly unusual and suspicious to have so many genetic specimens <u>before</u> a doctor determined the medical necessity for the genetic tests. Nonetheless, the Defendant immediately agreed to sign CGx orders for patients with whom he had no relationship, had no contact before the genetic tests were ordered, and would provide no follow-up after the tests were performed.

45. It was part of the conspiracy that the Defendant signed the orders and caused the laboratories receiving his CGx and PGx orders to submit reimbursement claims to health care benefit programs. The laboratories billed $53,163,788 to Medicare Part B, which paid $18,228,297, an average of $6,389 for each of the 2,853 Medicare Part B patients for whom the Defendant was listed as the ordering physician.

**Defendant's Fraudulent Orders for Topical Creams**

46. It was part of the conspiracy that the Defendant ordered medically unnecessary topical creams for patients, who did not request or need the creams and had never heard of the Defendant. Between October 17, 2017 and April 28, 2020, the Defendant caused Medicare Part D to pay $365,606 to pharmacies for topical creams that he ordered. Medicare Part D paid an average of $1,774 for the topical creams for each of the 206 patients for whom the Defendant ordered topical creams.

47. Of the 206 patients for whom the Defendant ordered topical creams, 56 of these

13

patients had their prescriptions filled by one of three pharmacies located in the St. Louis, MO area.

**Defendant's Receipt of Illegal Kickbacks for Orders**

48. It was part of the conspiracy that from 2017 to 2019, the Defendant received illegal kickbacks for signing, authorizing, and ordering Health Care Services, when he had not assessed the patients and had not determined the medical necessity for the Health Care Services. The companies, from whom the Defendant received illegal kickbacks, typically paid him $30 for each order. The payments to the Defendant by each company are reflected in the chart below:

| Company | Amount Paid | Dates |
| --- | --- | --- |
| AtMed | $22,780.00 | 5/24/2018 – 1/13/2018 |
| BodMD | $47,011.45 | 1/8/2019 – 1/16/2019 |
| FireFly XD | $79,306.00 | 4/10/2019-2/24/2020 |
| Life Recruiting | $25,114.00 | 10/30/2018-3/27/2019 |
| Locum Tenens | $481,791.47 | 10/23/2017-3/31/2020 |
| Lotus Health | $18,060.00 | 2/4/2019-9/17/2019 |
| TOTAL | $674,062.92 | |

**Overt Acts**

49. In furtherance of the conspiracy and to affect the objects of the conspiracy, the overt acts listed below and other overt acts were committed in the Eastern District of Missouri:

    a. On or about November 28, 2018, Integrity Medical Supply submitted a reimbursement claim for orthotics ordered by the Defendant for patient L.T.

    b. On or about December 13, 2018, MC Medical Supply submitted a reimbursement claim for orthotics ordered by the Defendant for patient D.K.

14

c. On or about August 8, 2018, Personalized Genetics submitted a reimbursement claim for genetic tests ordered by the Defendant for patient J.S.

d. On or about January 18, 2019, Performance Laboratories, L.L.C. submitted a reimbursement claim for genetic tests ordered by the Defendant for patient V.T.

e. On or about September 26, 2018, Cardinal Care Pharmacy submitted a reimbursement claim for a topical cream ordered by the Defendant for patient J.J.

f. On or about October 24, 2018, Cardinal Care Pharmacy submitted a reimbursement claim for a topical cream ordered by the Defendant for patient W.R.

All in violation of Title 18, United States Code, Section 371.

## Counts 2-25
## Health Care Fraud Scheme
## 18 U.S.C. § 1347(a)(I) and 18 U.S.C. § 2

50. Paragraphs 1-16 and 20-48 are incorporated by reference as if fully set out herein.

51. As a medical doctor and a Medicare provider since 2005, the Defendant knew that Medicare and Medicaid and other federal health care benefit programs would only reimburse for services that a physician or qualified health care professional had determined to be medically necessary. The Defendant knew that he did not have a doctor-patient relationship with the telemedicine patients for whom he ordered Health Care Services and had not determined that they needed Health Care Services.

52. It was further part of the scheme and artifice to defraud that the Defendant knowingly and willfully solicited and received illegal kickbacks in exchange for orders he signed for medically unnecessary services, including orthotics, which he knew would be paid in whole or part by Medicare or Medicaid. The Defendant also knew that Medicare and Medicaid would not pay providers for items or services obtained by illegal kickbacks.

53. It was further part of the conspiracy that co-conspirators Brandy McKay, Jamie McCoy, and Jackson Siples paid illegal kickbacks for certain orthotic orders signed by the Defendant and referred or sent to Integrity Medical Supply and MC Medical Supply. The chart below reflects some of the illegal kickbacks that Integrity Medical paid to R&L Marketing for physician orders, including some orders signed by the Defendant.

| Date of Kickback Payment | Amount of Kickback Payment | Paid to | Paid By |
| --- | --- | --- | --- |
| 9/6/2018 | $170,000 | R&L Marketing | Integrity Medical |
| 9/28/2018 | $225,000 | R&L Marketing | Integrity Medical |
| 10/26/2018 | $194,000 | R&L Marketing | Integrity Medical |
| 11/8/2018 | $170,000 | R&L Marketing | Integrity Medical |
| 11/16/2018 | $110,000 | R&L Marketing | Integrity Medical |

54. It was further part of the scheme and artifice to defraud that the Defendant and his co-conspirators submitted and caused to be submitted reimbursement claims to Medicare and Medicaid for medically unnecessary services which were obtained as a result of illegal kickbacks.

55. On or about the dates listed below, in the Eastern District of Missouri,

**SCOTT TAGGART ROETHLE, M.D.,**

the Defendant herein, knowingly and willfully executed, and attempted to execute, the above described scheme or artifice to defraud Medicare, which is a health care benefit program, in

16

connection with the delivery and payment for health care benefits, items, and services, that is, the Defendant caused DME companies and pharmacies to submit to Medicare false and fraudulent reimbursement claims for medically unnecessary orthotic braces and topical creams based on orders signed by the Defendant who had received an illegal kickback payment for each order he signed.

| Count | Patient | Date of Service | Date of Claim | Braces or Creams Ordered | Amount Paid | Paid to |
|---|---|---|---|---|---|---|
| 2 | A.B. | 10/30/2018 | 11/9/2018 | 1 back, 2 ankle, 1 shoulder | $2,030.65 | MC Medical Supply |
| 3 | A.C. | 11/27/2018 | 1/10/2019 | 1 shoulder, 1 knee, 1 suspension sleeve | $1,617.67 | M&M Medical |
| 4 | A.C. | 12/4/2018 | 12/5/2018 | 1 knee, 1 suspension sleeve | $775.26 | Universal Medical Solutions |
| 5 | A.P.C. | 11/27/28 and 11/29/2018 | 11/29/2018 and 11/30/2018 | 1 back, 1 shoulder, 1 wrist | $1,828.96 | Modern Medical Equipment |
| 6 | J.C. | 10/10/2018 | 10/16/2018 | 2 ankle, 1 wrist, 1 shoulder | $1,711.09 | MC Medical Supply |
| 7 | R.C. | 10/9/2018 | 10/10/2018 | 2 knee, 1 back, 1 suspension sleeve | $2,452.38 | Back Braces Plus, Inc. |
| 8 | B.D. | 12/4/2018 | 12/14/2018 | 1 shoulder, 1 wrist, 2 knee, 2 suspension sleeves | $2,477.64 | Integrity Medical Supply |
| 9 | T.E. | 8/2/2018 | 8/9/2018 | 1 back, 1 wrist, 2 knee, 2 suspension sleeves | $1,916.83 | Integrity Medical |
| 10 | C.F. | 11/28/2018 | 12/7/2018 | 1 shoulder, 1 wrist, 2 ankle | $1,282.03 | Integrity Medical Supply |
| 11 | J.K. | 11/27/2018 | 12/6/2018 | 1 back, 2 knee, 2 suspension sleeves | $2,419.32 | Integrity Medical Supply |
| 12 | V.K. | 9/24/2018 | 9/25/2018 | 2 ankle, 1 back, 2 knee, 1 suspension sleeve | $3,162.20 | Avondale HME Inc. |
| 13 | V.K. | 12/18/2018 | 1/7/2019 | 1 wrist | $ 732.63 | Durable Medical Supply, Inc. |
| 14 | J.M. | 11/5/2018 | 11/20/2018 | 1 back, 1 shoulder, 2 ankle | $2,172.47 | MC Medical Supply |
| 15 | L.M. | 8/2/2018 | 8/7/2018 | 1 back, 1 knee, 1 suspension sleeve | $1,933.74 | Embrace of Clearwater, Inc. |
| 16 | L.M. | 10/17/2018 | 11/1/2018 | 2 ankle, 2 wrist | $1,442.44 | Friendcare Inc. |

| Count | Patient | Date of Service | Date of Claim | Braces or Creams Ordered | Amount Paid | Paid to |
|---|---|---|---|---|---|---|
| 17 | C.P. | 4/17/2018 | 4/18/2018 | 2 wrist | $ 732.18 | Aviva Care Pharmacy, LLC |
| 18 | C.P | 11/5/2018 | 11/6/2018 | 2 ankle, 1 knee, 1 suspension sleeve | $1,485.08 | First Stop Medical Supply, Inc |
| 19 | D.S. | 9/24/2018 | 10/2/2018 | 1 back, 2 ankle, 1 shoulder | $2,172.47 | MC Medical Supply |
| 20 | M.S. | 10/9/2018 | 10/18/2018 | 1 back, 2 knee, 2 suspension sleeves | $1,550.52 | Integrity Medical Supply |
| 21 | D.W. | 8/31/2018 | 9/4/2018 | 2 knee, 1 suspension sleeve | $1,550.54 | Discovery Medical Supply, Inc. |
| 22 | D.W. | 9/10/2018 | 9/11/2018 | 1 back | $ 901.84 | Discovery Medical Supply, Inc. |
| 23 | L.H. | 8/31/2018 | 8/31/2018 | Clobetasol Ointment, Calcipotriene cream, Lidocaine ointment | $1,529.59 | Cardinal Care Pharmacy |
| 24 | S.H. | 10/17/2018 | 10/17/2018 | Doxepin HCL, Diclofenac Sol, Lidocaine ointment | $2,639.83 | Phoenix DME |
| 25 | J.M. | 9/7/2018 | 9/7/2018 | Calcipotriene cream, Fluocinonide cream, Lidocaine ointment | $2,552.46 | Cardinal Care Pharmacy |

All in violation of Title 18, United States Code, Section 1347(a)(l) and (2) and Section 2.

## FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1. Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of an offense in violation of Title 18, United States Code, Section 1347, including conspiracy to commit such offenses, as set forth in Counts 1 through 25, the defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. Subject to forfeiture

is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

2. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____
FOREPERSON

SAYLER A. FLEMING
United States Attorney

_____
DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney